# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 16-10032-EFM |
| SARAH HOPKINS, | ) |
| Defendant. | ) |

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

COMES NOW, the defendant, SARAH J. HOPKINS, by and through counsel, Douglas L. Adams, Jr., and respectfully submits this memorandum of law in support of her Motion to Suppress Statements.

**I.  Facts of the case.**

On February 25, 2016, Cedric Ford shot and killed several people and wounded several others in Newton and Hesston, Kansas. The subsequent investigation revealed that Defendant was a former girlfriend of Ford. A search of Ford's residence uncovered documents indicating that Defendant had purchased one of the firearms used by Ford during the shooting. (Report of Investigation of Jason Fuller (hereinafter "Fuller Report"), ¶ 1).

On February 26, 2016, at approximately 2:30 a.m., four uniformed and armed ATF agents went to Defendant's home in Newton, Kansas. They knocked on the door, and Roy Hopkins, Defendant's father, answered. The agents told Roy they were investigating the Ford shootings and needed to speak with the Defendant. (Fuller Report, ¶¶ 1-2).

Roy did not allow the agents to enter the residence. Instead, he called for Defendant, who was asleep at the time, and told her ATF agents needed to talk to her about Ford. Defendant,

who was still dressed in her pajamas, came to the door.  The agents asked if they could come inside because of the cold weather.  Defendant acquiesced and allowed them to enter.

Two agents sat on Defendant's sofa in her living room.  Defendant stood by her fireplace about three feet from these two agents.  The other two agents stood in front of the closed front door.  They were about five feet from Defendant.  Defendant would have been unable to leave unless these two agents moved or she asked them to move.

For the next one to one and a half hours, the agents questioned Defendant about her relationship with Ford, the fact that she purchased weapons while in a relationship with Ford (a convicted felon), and the fact she gave Ford at least one of the firearms used in the shooting. (Fuller Report, ¶ 3).

Fuller's Report indicates that, at one point, Roy asked if they needed to get an attorney. According to the Report, "Sarah HOPKINS indicated to Roy HOPKINS that she wanted to speak with the agents."  (Fuller Report, ¶ 3(f)).  According to both Defendant and Roy, the agents told Defendant that she did not need an attorney during their questioning.

At the end of their interrogation, the agents left Defendant's residence.  She was arrested several hours later on the same day.

Additional facts will be recounted as needed in discussing the legal issues below.

**II. Defendant was constructively arrested inside of her home without a warrant in violation of the Fourth Amendment; consequently, her unconstitutional arrest tainted her subsequent consent for the ATF agents to enter her home, and requires that her statements to the agents be suppressed as the fruit of the poisonous tree.**

      A.      **The Fourth Amendment secures the sanctity of the home.**

The Fourth Amendment to the United States Constitution provides, in relevant part, as follows:

> The right of the people *to be secure in their persons, houses*, papers, and effects, against unreasonable searches and seizures, *shall not be violated*

(Emphasis added).

In Payton v. New York, 445 U.S. 573, 585, 63 L.Ed.2d 639, 100 S.Ct. 1371 (1980), the United States Supreme Court noted that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." The Payton Court went on to hold that it is a "'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." 445 U.S. at 586.

The Payton Court summarized its holding as follows:

> In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

445 U.S. at 590.

**B.  Defendant was constructively arrested in her home in violation of the Fourth Amendment.**

In United States v. Reeves, 524 F.3d 1161, 1168 (10th Cir. 2008), the Tenth Circuit held that a Payton violation can occur other than by law enforcement's physical entry into the home. Rather, "it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home.". The Reeves Court went on to hold: "Opening the door to one's home is not voluntary if ordered to do so under color of authority. . . if an individual's decision to open the door to his home to the police is not made voluntarily, the individual is seized inside his home," in violation of Payton. 524 F.3d at 1167-68. This is true regardless of whether the officers were conducting an arrest or an investigatory detention. 524 F.3d at 1167.

In Reeves, supra, three officers knocked on the door of the defendant's motel room, while

identifying themselves as police officers for a number of minutes. This occurred between 2:30 a.m. and 3:00 a.m., "a time which must be taken into consideration when analyzing the coerciveness of the encounter." 524 F.3d at 1168-69. Although there was no evidence that the officers ordered the defendant to open the door, the Tenth Circuit found that the officers' actions were effectively a command to open the door. The Tenth Circuit concluded that a reasonable person faced with several police officers knocking at their door in the early morning hours "would not feel free to ignore the officers' implicit command to open the door." 524 F.3d at 1169. Under these circumstances, the Tenth Circuit concluded that when the defendant did answer his door, he did so in response to a show of authority and was seized inside of his home in violation of the Fourth Amendment. 524 F.3d at 1169.

The Reeves Court further held that the defendant's unlawful arrest rendered his subsequent consent to search involuntary, and the evidence gathered as a result of that search should have been suppressed as the fruit of the poisonous tree. 524 F.3d at 1170-71.

Likewise, in United States v. Jerez, 108 F.3d 684, 691-83 (7th Cir. 1997), officers knocked on a motel room door for three minutes and identified themselves as police officers. The officers asked the residents to open the door and shined their flashlights into the window. The Seventh Circuit concluded that the subsequent opening of the door by the defendant was a submission to a show of authority that constituted a seizure under the Fourth Amendment.

Also, in United States v. Saari, 272 F.3d 804, 809 (6th Cir. 2001), the Sixth Circuit concluded that when officers summoned the defendant to exit his home under a show of authority, the defendant reasonably believed he had no choice but to comply; consequently, his warrantless arrest was accomplished within his home, in violation of Payton and the Fourth Amendment.

The factors in Reeves that compelled the Tenth Circuit to conclude the defendant was constructively arrested in his home in violation of Payton are present in the case before this Court. Four armed and uniformed ATF agents knocked on the door of Defendant's residence at 2:30 in the morning. They demanded to speak with Defendant concerning their criminal investigation of the shooting involving Cedric Ford. As noted by the Reeves Court, the early morning hours of this encounter between law enforcement and Defendant "must be taken into consideration when analyzing the coerciveness of the encounter." 524 F.3d at 1168-69.

A reasonable person in Defendant's position would not have felt free to ignore the agents' request to come to the door and speak with them. Defendant was in her pajamas, which suggests that she considered the demands of the agents to be so urgent that she did not have time to change into regular clothes. As in Reeves, Defendant came to the door in response to a show of authority; consequently, her warrantless arrest by law enforcement inside of her home violated the Fourth Amendment as interpreted in Payton.

Further, as in Reeves, Defendant's unconstitutional arrest rendered involuntary her subsequent "consent" for the agents to come inside and speak with her. In Jerez, a case relied upon by the Reeves Court, the Seventh Circuit held that the taint of the defendant's illegal seizure inside of their motel room vitiated their subsequent consent to search. The Jerez Court held that there is a "heavy burden" on the government to establish that the taint has been purges, and the court looks to three factors 1) the temporal proximity of the illegal detention and the defendant's consent; 2) the presence of any intervening factors between the two events; and 3) the circumstances and nature of the official misconduct. 108 F.3d at 694-95.

In the present case, as in Jerez, Defendant's acquiescence for the agents to come into her home to speak with her was a mere submission to authority which immediately became an illegal

seizure.  There were no intervening factors that broke the causal chain between Defendant's illegal arrest and her statement.  Finally, the nature of this encounter was coercive from the beginning.  Multiple armed agents knocked on Defendant's door at 2:30 in the morning and demanded that she speak with them about a criminal investigation.  It was intentional and designed to show force and gain entrance into Defendant's house for the purpose of questioning her about her involvement with Ford at a time when she would be most defenseless, drowsy from sleep, without any place to go to retreat from law enforcement and their demands.  Under these circumstances, the Defendant's statement should be suppressed as the fruit of her unconstitutional arrest within her own home.

**III.  Defendant was subjected to custodial interrogation without the benefit of <u>Miranda</u> warnings; consequently, her statement to the ATF agents must be suppressed from the government's case-in-chief.**

    **A.    Requirements of <u>Miranda</u>**

In <u>Miranda v. Arizona</u>, 384 U.S. 436, 444-45, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966), the United States Supreme Court held that law enforcement officers must give the <u>Miranda</u> warnings only when a suspect is subjected to "custodial interrogation."

A person is "in custody" for <u>Miranda</u> purposes when they have been "deprived of their freedom of action in any significant way."  384 U.S. at 444.  The analysis of the circumstances is an objective one, and this Court must ask whether "a reasonable [person] in the suspect's position would have understood [her] situation . . . as the functional equivalent of formal arrest."  <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

"Interrogation" for <u>Miranda</u> purposes "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response."  <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-301, 100

S.Ct. 1682, 64 L.Ed.2d 297 (1980).

B. **Defendant was subjected to custodial interrogation by four ATF agents in her home.**

In Orozco v. Texas, 394 U.S. 324, 326-27, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), the United States Supreme Court held that the defendant was "in custody" for Miranda purposes when he was interrogated by police officers in his bedroom. The Supreme Court rejected the State's argument that Miranda did not apply because the defendant was questioned in his own bedroom, in familiar surroundings. 394 U.S. at 326. The evidence showed that the defendant was questioned by four police officers in his bedroom in the early hours of the morning. The Supreme Court held that the defendant was not free to leave and was essentially under arrest; consequently, Miranda warnings were required. 394 U.S. at 327.

The Tenth Circuit in United States v. Revels, 510 F.3d 1269 (10th Cir. 2007), affirmed the suppression of the defendant's statement because she was subjected to custodial interrogation in her home, and the failure of the officers to give her Miranda warnings required that her statement to the officers be suppressed. 510 F.3d at 1275-77.

The Tenth Circuit articulated several factors that are relevant in determining the custody issue: "1) whether the circumstances demonstrated a police-dominated atmosphere; 2) whether the nature and length of the officers' questioning was accusatory or coercive; and 3) whether the police made Revels aware that she was free to refrain from answering questions, or to otherwise end the interview." 510 F.3d at 1275.

1. **Defendant's home was dominated by police.**

In Revels, the Tenth Circuit found that the circumstances demonstrated a police-dominated atmosphere in the defendant's home. The police entered the defendant's home to

execute a search warrant in the early morning hours, stayed with the defendant the entire time of their interrogation behind a closed door, and separated her from her boyfriend and two children. 510 F.3d at 1275. Although the defendant was given some limited freedom to dress herself and tend to her infant, "Revels reasonably understood that the officers were unambiguously in control of the events, and that she was not free to leave." 510 F.3d at 1276.

Likewise, in United States v. Craighead, 539 F.3d 1073 (9th Cir. 2008), the Ninth Circuit held that the defendant was subjected to custodial interrogation in his home without the benefit of Miranda warnings. Although the defendant was not handcuffed or physically restrained, he was confined to a storage room behind a closed door. In order to get to the room's only door, he "would have either had to have moved the police detective or asked him to move." 539 F.3d at 1086. Under these circumstances, the Ninth Circuit held that the defendant's home was police-dominated:

> When a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation. Similarly, when the number of law enforcement personnel far outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he will encounter on the way out. The suspect may also believe that the large number of officers was brought for the purpose of preventing his departure . . . In short, the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere.

539 F.3d at 1084-85.

In United States v. Goodridge, 945 F.Supp. 359 (D. Mass. 1996), the federal magistrate judge recommended that the defendant's motion to suppress statements be granted when he was subjected to custodial interrogation in his home without Miranda warnings. In Goodridge, the federal magistrate held that, "although Goodridge was questioned in familiar surroundings, a

deprivation of freedom can as readily take place in one's home as at a police station." 945 F.Supp. at 365. While no physical restraints were placed on the defendant, at least two officers were present at all times during the questioning, and the defendant was not free to leave during the questioning. *Id*.

In the present case, four armed, uniformed ATF agents came into Defendant's home in the early morning hours of February 26, 2016, and stationed themselves in the small living room. Two agents sat on Defendant's sofa and were approximately three feet from where Defendant stood. The other two agents stood right in front of the closed front door approximately five feet from where Defendant was standing. As in Craighead, Defendant would have been unable to exit her house unless the agents moved out of her way or she asked them to move.

Although no actual physical restraints were placed on Defendant, and her father and sister were allowed to remain in the living room, all four agents stayed in their respective positions in the living room with Defendant for the entirety of the one and one-half hour interrogation. Defendant was not free to leave the living room area. As in Revels, Craighead, and Goodridge, the presence of a large number of armed government agents in Defendant's small living room, two of whom were blocking the only outside exit, made her home a police-dominated atmosphere.

      **2.  Nature of the questioning was accusatory.**

In Revels, the Tenth Circuit held that the officers confronted the defendant with contraband in an accusatory manner. The Court concluded that "we have no doubt Revels would have reasonably felt compelled to cooperate with the police." 510 F.3d at 1276.

In the present case, for 1 ½ hours, the agents questioned Defendant about her relationship with Cedric Ford, and her knowledge of the weapons Ford used to commit a mass shooting the

previous day. Prior to going to Defendant's residence, the agents had information that Defendant had purchased one of the firearms used by Ford in the shooting.

Their questioning elicited incriminating statements from Defendant that the weapons Ford used to commit the shooting were hers, that she had purchased guns for Ford while they were in a relationship, that she retrieved the firearms after the two broke up, and that she had subsequently given the guns to Ford about a week later. In response to questions, Defendant told the agents she was aware that Ford had looked up ways to make guns "automatic." She also stated that the money she used to buy the guns was "our" (Defendant and Ford's) money.

This was express questioning by the agents which was designed to and did elicit incriminating statements from Defendant. Under <u>Innis</u>, there is no question this was "interrogation" for <u>Miranda</u> purposes. Further, as in <u>Revels</u>, the nature of the questioning was accusatory because Defendant was repeatedly confronted with the fact that she purchased and gave the guns to Ford which he used in the shooting.

In <u>Goodridge</u>, the defendant asked the interrogating officers whether he needed an attorney. Instead of treating the defendant's question as an equivocal request for counsel or assertion of the right to silence, the interrogating officer ignored the statements and continued his interrogation. The federal magistrate concluded that the defendant's statements regarding an attorney was an additional indication of the custodial nature of the questioning. The federal magistrate elaborated on this issue as follows:

> However, unless Goodridge is arguing that he fully understood that Miranda rights were applicable, that he understood those rights and they need not have even been communicated to him by the FBI, the Court cannot presume for purposes here that he understood those rights at the time they ought to have been provided. The Court, therefore, need not make a determination as to whether Goodridge's Miranda rights were invoked when they were not even given, or whether they were waived when the agents themselves thought them unnecessary, or whether

> Goodridge clearly articulated his request for counsel. Rather, in the Court's view, Goodridge's statements and Montonari's response . . . simply add flavor to the custodial character of the interrogation from its inception.

945 F.Supp. at 367.

In the present case, when the agents began questioning Defendant about the guns, her father asked if they needed an attorney. The agents replied that Defendant did not need an attorney. This response was much more egregious than what occurred in <u>Goodridge</u>. The agents herein affirmatively misrepresented Defendant's right to an attorney at the very time <u>Miranda</u> warnings should have been given. As in <u>Goodridge</u>, this is yet one more indication of the custodial nature of the agents' questioning. A reasonable person in Defendant's position, having been misinformed about her right to the aid of counsel, would have felt compelled to cooperate with the agents and answer their questions.

### 3. Defendant was not informed she had the right to end the interrogation.

Finally, as in <u>Revels</u>, the agents never informed Defendant that she was free to refrain from answering their questions, or to otherwise end the interrogation. In fact, based upon the agents' response to the question about an attorney, there was a misrepresentation of Defendant's ability to terminate this interrogation. The agents purportedly told her that she didn't need an attorney; rather, she only needed to answer their questions. Given this response in combination with the police dominated atmosphere in Defendant's home, a reasonable person in Defendant's position would assume she could neither leave nor end the questioning.

Defendant acknowledges that, unlike the situation in <u>Revels</u>, she was not arrested at the conclusion of the agents' interrogation. (She was arrested a few hours later on the same day as the interrogation). That is but one factor that is be considered under the totality of the circumstances. In <u>Craighead</u>, the defendant was not arrested at the end of his in-home interrogation. He was also

informed that he was not under arrest and that he was free to leave. 539 F.3d at 1087. Nevertheless, the Ninth Circuit concluded that the defendant was in custody for purposes of Miranda because his home had become a police-dominated atmosphere, and he was questioned in a storage room with an armed guard by the door. The Court concluded: "Craighead reasonably believed that there was simply nowhere for him to go." 539 F.3d at 1089.

In the present case, Defendant was questioned in the living room of her home by four armed ATF agents for 1 ½ hours beginning at 2:30 a.m. in the morning. Two of those agents stood by the only outside exit in the room. Unlike the situation in Craighead, Defendant was never told she was free to leave or that she could otherwise terminate the interview; rather, she was misinformed that she did not need an attorney at the very moment she needed one. Under the totality of the circumstances, this Court must find that Defendant was subjected to custodial interrogation in her home without the benefit of Miranda warnings. As such, her statement to the agents must be suppressed from the government's case-in-chief.

WHEREFORE, for the reasons stated above, Defendant requests that this Court enter an order suppressing the Defendant's statements to law enforcement that were taken in violation of the Fourth and Fifth Amendments to the United States Constitution.

Respectfully submitted,

s/ Douglas L. Adams, Jr.
Douglas L. Adams  #16092
Ney & Adams
200 N. Broadway, Suite 100
Wichita, Kansas 67202
(316) 264-0100
Fax: (316) 264-1771
Email: adams@naslaw.net
Attorney for Defendant Sarah J. Hopkins

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS was delivered to the United States Attorney's Office and all other interested parties on this 29th day of June, 2016, through the electronic filing procedures of the United States District Court.

                                                    s/ Douglas L. Adams, Jr.
                                                   Douglas L. Adams, #16092